ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL DE APELACIONES
**PANEL ESPECIAL**

| | | |
|---|---|---|
| **LYMARI RIVERA TORRES**<br>DEMANDANTE(S)-APELADA(S)<br><br><br>V.<br><br><br>**EDWIN ELÍAS RIVERA OYOLA T/C/C EDWIN ELÍAS RIVERA AYALA**<br>DEMANDADA(S)-APELANTE(S) | **KLAN202301143** | *APELACIÓN*<br>procedente del Tribunal de Primera Instancia, Sala Superior de **CAROLINA**<br><br>Caso Núm.<br>**CA2022RF00436 (405)**<br><br>Sobre:<br>Divorcio<br>(Custodia/Hogar Seguro) |

Panel integrado por su presidenta, la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón.

*Barresi Ramos*, juez ponente.

**S E N T E N C I A**

En San Juan, Puerto Rico, hoy día 7 de agosto de 2025.

Comparece ante este Tribunal de Apelaciones, el señor **EDWIN ELÍAS RIVERA OYOLA T/C/C EDWIN ELÍAS RIVERA AYALA** (señor **RIVERA OYOLA**) mediante *Alegato del Apelante* interpuesto el 21 de diciembre de 2023. En su recurso, nos solicita que revisemos la *Resolución de Hogar Seguro* dictaminada el 2 de octubre de 2023 por el Tribunal de Primera Instancia, Sala Superior de Carolina, disponiendo la residencia ganancial sita en Trujillo Alto, Puerto Rico, como *hogar seguro* en beneficio de los tres (3) menores, en la modalidad de *casa nido,* y modificó la *custodia compartida* dispuesta mediante la *Minuta Resolución* fechada 8 de febrero de 2023.[1]

Exponemos el trasfondo fáctico y procesal que acompaña a la presente controversia.

---

[1] Este dictamen judicial fue notificado y archivado en autos el 3 de octubre de 2023. Apéndice del *Alegato del Apelante,* págs. 200- 215.

Número Identificador: SEN2025_____

- I -

El 28 de junio de 2022, la señora **LYMARI RIVERA TORRES** (señora **RIVERA TORRES**) incoó *Demanda* sobre divorcio por la causal de ruptura irreparable.[2] Más tarde, el 9 de agosto de 2022, la señora **RIVERA TORRES** presentó *Moción Sometiendo Demanda Enmendada* acompañada de su *Demanda Enmendada,* a los únicos efectos de incluir una solicitud de *hogar seguro*.[3] El 23 de septiembre de 2022, el señor **RIVERA OYOLA** presentó su *Contestación a Demanda Enmendada y Reconvención* incluyendo sus defensas afirmativas.[4] Interpeló entre otras cosas: 1) un señalamiento ante el(la) examinador(a) de pensiones alimentarias para fijar la obligación alimentaria a favor de los menores; (2) se le asignara una pensión ex cónyuge que provenga de los ingresos de la señora **RIVERA TORRES** hasta que pudiera establecer los medios adecuados y suficientes para su propio sustento; (3) las relaciones maternofiliales queden a la discreción del tribunal; (4) se declarara *hogar seguro* la residencia ubicada en Plaza Serena #161 en Trujillo Alto, Puerto Rico, para poder ocuparla junto a sus hijos; y (5) cualquier otro remedio que conforme a derecho proceda

El día 12 de octubre de 2022, la señora **RIVERA TORRES** presentó *R[é]plica a Reconvención* conteniendo sus defensas afirmativas; y *Moción Solicitando Referido a la Unidad Social* para dilucidar la controversia sobre custodia de los menores.[5] Al día siguiente, el 13 de octubre de 2022, se celebró la audiencia sobre fijación de *pensión alimentaria*.[6] Mediante el *Informe* emitido por el(la) Examinador(a) de Pensiones Alimentaria, ante el hecho de que los menores EARR y NMRR residían en compañía del señor **RIVERA OYOLA** y la menor MSRR residía en Tampa con un familiar, se estipuló una *pensión alimentaria provisional* de $1,121.00 mensuales ($560.50 quincenales) a satisfacerse por la señora **RIVERA TORRES**.

---

[2] Apéndice del *Alegato del Apelante,* págs. 1- 3.
[3] *Íd.,* págs. 25- 27.
[4] *Íd.,* págs. 52- 58.
[5] Apéndice del *Alegato del Apelante,* págs. 62- 67 y 68- 69.
[6] *Íd.,* págs. 90- 92

Posteriormente, el 19 de octubre de 2022, el foro primario dictó una *Orden a Unidad Social* para efectuar evaluación sobre custodia monoparental.[7] El 24 de octubre de 2022, se celebró el juicio en su fondo y se dispuso la *Sentencia* sobre divorcio, en la cual, entre otras cosas, se declaró ha lugar la *Demanda* sobre divorcio decretando roto y disuelto el vínculo matrimonial por la causal de ruptura irreparable; se le concedió la *custodia provisional* de los menores al señor **RIVERA OYOLA**; y se otorgó *patria potestad* compartida.[8] Ante las solicitudes de *hogar seguro* y *custodia* presentadas por ambas partes, se pautó audiencia sobre lectura de *Informe Social* para el 8 de febrero de 2023.

El 5 de noviembre de 2022, se profirió una *Resolución* en la cual se acogieron las recomendaciones del *Informe* de la Examinadora de Pensiones Alimentarias y se impuso la *obligación alimentaria* a satisfacerse por la señora **RIVERA TORRES**.[9]

Al tiempo, el 25 de enero de 2023, la señora Miriam Velázquez Cruz, trabajadora social, rindió un *Informe Social Forense*.[10] En su escrito, recomendó:

1. La custodia de las menores [NM] y [MS] les sea otorgada de forma compartida a ambos padres. Hay que aclarar que [MS] reside en los Estados Unidos por acuerdo de ambos padres. No se recomienda horario porque el tiempo dependerá de la disponibilidad de las menores según sus responsabilidades y compromisos.
2. La custodia del menor [EA] le sea otorgada a ambos padres de forma compartida. El plan de custodia sea de los primeros dos fines de semanas y el último fin de semana de viernes a las 5:00 p.m. hasta el domingo a las 6:00 de la tarde esté con la madre. Esté con el padre de lunes a viernes semanalmente y el penúltimo fin de semana del mes desde el viernes a la salida de la escuela hasta el siguiente viernes cuando le correspondería estar con la madre.
3. En la celebración del día de madres/padres[,] los menores compartan con el progenitor de su celebración desde el día antes hasta el día de la celebración. En el caso de [EA]si es que no coincide con el plan de custodia compartida.
4. Durante el periodo navideño[,] los progenitores tengan a los menores la mitad del tiempo del receso de clases, la primera mitad la tenga un progenitor y la segunda mitad el otro progenitor y se alternen las mitades cada año.

---

[7] Apéndice del *Alegato del Apelante,* págs. 77- 79.
[8] Fue notificada y archivada en autos el 27 de octubre de 2022. Apéndice del *Alegato del Apelante,* págs. 88- 89.
[9] *Íd.,* pág. 92.-93.
[10] *Íd.,* pág. 105- 130.

5. Ambos progenitores se integren a todos los asuntos de [EA] y se colaboren en la búsqueda y los servicios que este menor requiere, incluyendo los servicios en el área académica. Que mantengan los servicios con la neuróloga.

6. Los padres mantengan un ambiente seguro para los hijos. Además, cada uno mantenga al otro informado sobre los asuntos de los hijos.

El día siguiente, el 26 de enero de 2023, se determinó *Orden* autorizando la notificación del *Informe Social*.[11] El 8 de febrero de 2023, se celebró la audiencia sobre lectura de *Informe Social*.[12] Ambas partes se allanaron al contenido del *Informe Social* y reiteraron sus respectivas posiciones en relación con sus reclamaciones de *hogar seguro*.[13] El Tribunal, por su parte, recomendó que evaluaran la posibilidad de la figura novel de *Casa Nido* practicada en España, que no ha sido aplicada en Puerto Rico.[14] Así, se prescribió la *Minuta Resolución*.

Después, el 8 de marzo de 2023, la señora **RIVERA TORRES** presentó *Moción en Cumplimiento de Orden y Dando por Sometido el Asunto* aceptando la propuesta de fragmentar la vivienda familiar entre ambos progenitores con la salvedad de que prefería el periodo de estadía en rotación cada dos (2) semanas.[15] En vista de eso, el 27 de marzo de 2023, el señor **RIVERA OYOLA** presentó *Moción en Cumplimiento de Orden sobre Hogar Seguro* implorando que se le concediera la residencia como *hogar seguro* en beneficio de los menores , en especial sobre el menor EARR, toda vez que la *custodia* de este último le fue otorgada en no menos de un ochenta por ciento (80%) del tiempo.[16] Reiteró que es él quien se encuentra en una desventaja económica que impide que pueda adquirir su propia vivienda. Manifestó su oposición al hogar *"nido"* puesto que conllevaría contar con tres (3) propiedades (la de

---

[11] Apéndice del *Alegato del Apelante,* págs. 131- 132.

[12] *Íd.*, págs.141- 144.

[13] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 8 de febrero de 2023, en la pág. 7, líneas 19-25; pág. 8, líneas 22-25; pág. 9, líneas 1-5 y págs. 23-29.

[14] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 8 de febrero de 2023, en la pág. 25, líneas 4-25; pág. 26, líneas 1-23; pág. 27, líneas 1-25.

[15] Apéndice del *Alegato del Apelante,* págs. 146- 147.

[16] *Íd.*, págs. 152- 166. Junto a su escrito, anejó jurisprudencia del Tribunal Supremo de España (STS 396/2020 del 6 de julio de 2020) en la cual se escudriña la figura de "*Casa Nido*" y se opinó que es un sistema "que no es compatible con la capacidad económica de los progenitores, que se verían obligados a mantener tres viviendas (la de cada uno y la común), unido a la conflictividad que añadiría el buen mantenimiento de la vivienda común" y "la rotación en la vivienda familiar no es un sistema que vele por el interés de los menores, ni es compatible con la capacidad económica de los progenitores".

cada progenitor y la común), solución que considera antieconómica y requiere un intenso nivel de colaboración y entendimiento entre los progenitores.

Luego de varios incidentes procesales, concernientes a la incomparecencia de la señora **RIVERA TORRES**, el 6 de septiembre de 2025, se celebró la audiencia sobre *hogar seguro*. Ambas representaciones legales expusieron sus fundamentos para que se le concediera el *hogar seguro* a favor de su cliente. El desfile de prueba se inició con el testimonio de la señora **RIVERA TORRES.**[17] Narró que estuvo casada con el señor **RIVERA OYOLA** por aproximadamente veintisiete (27) años; vivían en una residencia ubicada en la Urbanización Encantada en Trujillo Alto; tenían tres (3) hijos en común y mientras estuvieron casados ella ejercía la profesión de ingeniería y el señor **RIVERA OYOLA** realizaba trabajos "misceláneos" como dar clases de música varias horas a la semana.[18] Aseguró que mientras estuvo casada, ella era quien llevaba la carga económica y financiera; quien pagaba el préstamo hipotecario y el plan médico.[19] Enunció que el menor EARR tiene problemas de aprendizaje, déficit de atención, hiperactividad y ansiedad, por lo que, se le dificulta estudiar y atender en clase.[20] Atestiguó que, a ese momento, su hija mayor se encontraba estudiando en la UPR de Río Piedras y su segunda hija regresó de los Estados Unidos y vivía con ella.[21] Relató que el señor **RIVERA OYOLA,** en el tiempo que estuvo en los Estados Unidos, se mudó con sus dos (2) hijos menores, y mientras estuvo allá ella sufragaba los gastos de renta del apartamento.[22] Refrendó que durante el proceso de divorcio, se

---

[17] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 6 de septiembre de 2023, en la pág. 10, líneas 1-24; pág. 12, líneas 1-25; pág. 13, líneas 1-4; 8-18; pág. 17, líneas 9-16; 20-25; pág. 18, líneas 1-20.

[18] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 6 de septiembre de 2023, en la pág. 23, líneas 1-24; págs. 24-25; pág. 27, líneas 5-11; pág. 28, líneas 20-25; pág. 29, líneas 1-9.

[19] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 6 de septiembre de 2023, en la pág. 29, líneas 10-20.

[20] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 6 de septiembre de 2023, en la pág. 30, líneas 1-14.

[21] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 6 de septiembre de 2023, en la pág. 30, líneas 23-25; pág. 31, líneas 2-14.

[22] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 6 de septiembre de 2023, en la pág. 46, líneas 23-25; pág. 47, líneas 1-19; pág. 48, líneas 6-7.

mudó con su madre para Naranjito, pues su hija mayor tenía unos entrenamientos del ROTC en los Estados Unidos; y ulteriormente, el señor **RIVERA OYOLA** regresó a Puerto Rico y se instaló en la propiedad en Trujillo Alto.[23] En relación al *hogar seguro*, pidió que se le otorgara, toda vez que al estar con ella más tiempo durante la semana, el menor EARR tendría un mejor aprovechamiento académico y lo podría ayudar más.[24]

En el contrainterrogatorio, la señora **RIVERA TORRES** apuntaló que el menor EARR estuvo un año en "*homeschooling*" (educación en casa) con el señor **RIVERA OYOLA** y pasó su octavo grado con un promedio aproximado de 95%.[25]

Sin dilación, el señor **RIVERA OYOLA** ofreció su testimonio. Matizó que el desempeño académico de los menores EARR y MSRR durante el año que estuvieron con en los Estados Unidos fue "excelente", sustentado en que a la menor MSRR le otorgaron una medalla de honor y los exámenes ofrecidos al menor EARR en el "*homeschooling*" (educación en casa) resultaron en notas satisfactorias (entre 95% y 100%).[26] Agregó que durante el segundo semestre cursado por el menor EARR, le consiguió una tutora para que le asistiera personalmente, y así lograr que las notas fueran sobresalientes en ese último semestre.[27] Finalmente, la representación legal del señor **RIVERA OYOLA** reiteró su súplica de *hogar seguro*, y planteó que se debía tomar en consideración la totalidad del *Informe Social Forense* del cual emana lo dispuesto sobre *custodia*.[28]

---

[23] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 6 de septiembre de 2023, en la pág. 49, líneas 14-25; pág. 50, líneas 1-25.

[24] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 6 de septiembre de 2023, en la pág. 52, líneas 9-25.

[25] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 6 de septiembre de 2023, en la pág. 58, líneas 1-4; pág. 59, líneas 12-15; pág. 60, líneas 1-8; pág. 61, líneas 1-18.

[26] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 6 de septiembre de 2023, en la pág. 73, líneas 12-15; pág. 74, líneas 4-15.

[27] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 6 de septiembre de 2023, en la pág. 75; líneas 15-25.

[28] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 6 de septiembre de 2023, en la pág. 86, líneas 1-22.

El 2 de octubre de 2023, el foro primario dictaminó la *Resolución de Hogar Seguro* apelada.[29] Las determinaciones de hechos son:

1. Las partes en el presente caso tienen tres hijos en común. La menor [NMRR], quien tiene 20 años, [MSRR], quien tiene 19 años y [EARR] de 14 años.
2. La casa familiar ubicada en 161 Calle Plaza Serena Trujillo Alto era el hogar conyugal.
3. Antes del 2017, el señor Rivera trabajaba dando clases de música. Desde el Huracán María, el señor Rivera estaba desempleado. Por lo tanto, este le sugirió a su entonces esposa, trasladarse a Florida para que ella consiguiera mejor empleo y evolucionaran.
4. Con la intención de que el señor Rivera pudiera conseguir un trabajo más estable y no esporádico, en julio de 2021, el padre se trasladó con MSRR y EARR a Florida. Allí se alquiló un apartamento. La señora Rivera se mantuvo por acuerdo en la casa de Trujillo Alto con la menor NMRR.
5. Llegado octubre de 2021, el padre no conseguía empleo y la señora Rivera estaba frustrada con la situación. La señora Rivera determinó solicitar el divorcio y permanecer en la casa de Trujillo Alto con la menor NMRR.
6. La señora Rivera es quien posee la estabilidad laboral y proveía el mayor ingreso al hogar.
7. La madre se quedó en el hogar conyugal con su hija mayor, ya que ella se inscribiría en el ROTC. En julio de 2022, NMRR se fue a tomar un adiestramiento en Kentucky del ROTC y la señora Rivera determinó visitar a su progenitora en Naranjito.
8. El 16 de julio de 2022, la señora Rivera le manifestó a su esposo la intención de divorciarse y de permanecer en el hogar.
9. Una semana después, el señor Rivera sin avisar y aprovechando que la madre visitaba a su progenitora en Naranjito, regresó con EARR al hogar matrimonial.
10. Cuando NMRR regresó del entrenamiento intentó permanecer con la madre en Naranjito mientras las clases no comenzaran, pero el horario universitario fue complejo y retornó a la casa de Trujillo Alto. También trabaja.
11. La menor MSRR permaneció estudiando en Florida.
12. El señor Rivera le manifestó a la señora Rivera que no tenía para donde ir y que se quedaría allí. La madre para evitar conflictos permaneció en Naranjito en la casa de su progenitora.
13. Las partes tienen buena comunicación.
14. Las dos hijas manifestaron tener preferencia por vivir con la madre.
15. La madre es quien saldó la residencia de Trujillo Alto.
16. El señor Rivera que (sic) no tiene la capacidad económica para alquilar o comprar otra propiedad.
17. Surge del estudio social, por voz de NMRR, que el padre se podría ir a vivir a Isla Verde con la abuela paterna.
18. La señora Rivera alega que con todos los compromisos económicos que tiene no le alcanza para alquilar o mudarse más cerca de Trujillo Alto.
19. El menor EARR estudia en décimo grado en Christian Military Academy, en la que los familiares del padre es la

---

[29] Apéndice del *Alegato del Apelante,* págs. 200- 215. Ello sin haber petitorio alguno sobre modificación de *custodia*.

directora escolar y que queda en Vega Baja. Las notas en noviembre 2022 no fueron las mejores. Durante el tiempo en Florida el menor estuvo en [homeschool] con el padre. Previo a ello, la madre es quien lo ayudaba en las tareas.

20. EARR tiene déficit de atención con hiperactividad tipo combinado. También trastorno de aprendizaje y lenguaje. Asimismo, problemas en el desarrollo.

21. El menor manifestó preferencia por vivir con sus padres juntos y que no podía elegir entre ellos.

Oportunamente, el 18 de octubre de 2023, el señor **Rivera Oyola** presentó *Moción a Varios Efectos*, en la cual clamó la reconsideración de la *Resolución de Hogar Seguro*.[30] El 1 de noviembre de 2023, la señora **Rivera Torres** presentó su *Oposición a la Moción de Reconsideración*.[31] El 20 de noviembre de 2023, se emitió *Orden* declarando no ha lugar a la reconsideración, manteniendo así, el fallo sobre *casa nido* sobre el hogar familiar.[32]

En desacuerdo con ese proceder, el 21 de diciembre de 2023, el señor **Rivera Oyola** acudió ante este foro intermedio revisor mediante su *Alegato del Apelante.* En el mismo, señala el(los) siguiente(s) error(es):

> Erró el Honorable Tribunal de Primera Instancia al Designar el hogar seguro como casa nido, a pesar de reconocer que existe jurisprudencia persuasiva que no favorece dicho régimen, ignorando así los aspectos que predicen el fracaso de la aplicación de la alternativa del "bird nesting" (presentes dos de los esenciales en este caso) y apoyando su determinación en especulaciones e ignorando y apartándose de los factores establecidos en nuestra ley y jurisprudencia a ser evaluados y considerados al momento de realizar la designación del hogar seguro.

> Erró el Honorable Tribunal de Primera Instancia al tomar una determinación basada en el prejuicio, la pasión y la parcialidad.

El 10 de enero de 2024, intimamos *Resolución* en la cual, entre otras cosas, concedimos un plazo de treinta (30) días para presentar alegato(s) en oposición al recurso y se reglamentaron los procedimientos en cuanto a la reproducción de la prueba oral. Concedida una prórroga, el 14 de marzo de 2024, la señora **Rivera Torres** presentó su *Alegato de la Demandante-*

---

[30] Apéndice del *Alegato del Apelante*, págs. 226- 241.
[31] *Íd.*, págs. 250- 262.
[32] *Íd.*, págs. 264- 265.

*Apelada.*

Consecuentemente, el 19 de agosto de 2024, expedimos *Resolución* acogiendo la transcripción de la prueba oral. El 13 de septiembre de 2024, el señor **RIVERA OYOLA** presentó su *Alegato Complementario del Apelante.* Otorgada una prórroga, el 4 de octubre de 2024, la señora **RIVERA TORRES** presentó *Alegato Complementario de la Demandante-Apelada.*

Evaluado concienzudamente el expediente del caso, habiendo revisado las transcripciones de las audiencias, y contando con el beneficio de la comparecencia de ambas partes, nos encontramos en posición de adjudicar. Puntualizamos las normas de derecho pertinentes a la(s) controversia(s) planteada(s).

- II -

- A - *Hogar Seguro*

Nuestro ordenamiento jurídico instituye mediante el Código Civil de Puerto Rico de 2020, el derecho de *hogar seguro*. Sustancialmente enuncia:

> Para conceder el derecho a **permanecer en la vivienda familiar**, el tribunal debe considerar las siguientes circunstancias:
> (a) los acuerdos de los cónyuges sobre el uso y el destino de la vivienda durante la vigencia del matrimonio y después de su disolución;
> (b) si el cónyuge solicitante mantiene la custodia de los hijos menores de edad;
> (c) si el cónyuge solicitante retiene la patria potestad prorrogada o la tutela de los hijos mayores incapacitados o con impedimentos físicos que requieren asistencia especial y constante en el entorno familiar;
> (d) si los hijos mayores de edad, pero menores de veinticinco (25) años, permanecen en el hogar familiar mientras estudian o se preparan para un oficio;
> (e) si la vivienda familiar es el único inmueble que puede cumplir razonablemente ese propósito dentro del patrimonio conyugal, sin que se afecte significativamente el bienestar óptimo de los beneficiados al momento de su concesión con más necesidad de protección;
> (f) si el cónyuge solicitante, aunque no tenga hijos o, de tenerlos, no vivan en su compañía, necesita de esa protección especial, por su edad y situación personal; y
> (g) cualquier otro factor que sea pertinente para justificar el reclamo.[33]

---

[33] 31 LPRA § 6852. (énfasis nuestro).

Por otra parte, el Artículo 477 del Código Civil de Puerto Rico de 2020 dispone expresamente sobre el derecho a permanecer en la vivienda familiar.[34] El mismo implanta:

> Cualquiera de los excónyuges o cualquiera de los hijos que quedan bajo su patria potestad, puede solicitar el derecho a permanecer en la vivienda de la Sociedad de Gananciales que constituye el hogar principal del matrimonio y de la familia antes de iniciarse el proceso de divorcio. Este derecho puede reclamarse desde que se necesita, en la petición de disolución del matrimonio, durante el proceso o luego de dictarse la sentencia. En los casos donde la vivienda familiar principal sea privativa de cualquiera de los excónyuges y exista otra vivienda perteneciente a la Sociedad de Gananciales, el Tribunal podrá establecer como vivienda familiar la propiedad perteneciente a la Sociedad de Gananciales. En los casos en que no exista una vivienda perteneciente a la Sociedad de Gananciales, el tribunal determinará como se cumplirá con el derecho a hogar seguro.

Es decir, una propiedad ganancial que constituye la vivienda familiar no estará sujeta a división o liquidación mientras dure cualesquiera de las condiciones en virtud de las cuales se concedió. Disponiéndose que el derecho de *hogar seguro* podrá reclamarse desde que se necesitare, pudiendo ser reclamado en la *Demanda* sobre divorcio, durante el proceso, o luego de decretarse el mismo. Por consiguiente, una vez reclamado, el(la) juzgador(a) determinará lo que en justicia procede de acuerdo con las circunstancias particulares de cada situación.[35]

Incluso, el cónyuge que reclama el derecho a *hogar seguro* podrá retener todos aquellos bienes de uso ordinario en la vivienda.[36] Como resultado, una vez adjudicada la vivienda familiar al progenitor custodio en favor de los hijos en común, la atribución se convierte en una forma de contribuir a las cargas de manutención de esos menores y como tal se debe tratar.[37]

Nuestro Máximo Foro observando la política pública que procura el beneficio y el interés optimo del(de la) menor ha interpretado que el derecho a *hogar seguro* se extiende a la vivienda familiar aun cuando la misma no

---

[34] 31 LPRA § 6851.
[35] *Íd.*
[36] 31 LPRA § 6854.
[37] *Candelario Vargas v. Muñiz Díaz*, 171 DPR 530, 547 (2007).

constituya un bien de carácter ganancial, sino un bien común entre excónyuges.[38] Además, decidió que "el derecho a hogar seguro se extiende también a la vivienda familiar habitual cuando ésta constituye un bien privativo del padre no custodio".[39]

Al precisar que el derecho a *hogar seguro* de los hijos se extiende al bien privativo del progenitor no custodio, el Alto Foro tomó en consideración las razones de política pública que permean el tema. En concreto, "que el reconocimiento del hogar seguro no afecta la titularidad; que la propiedad se utilizó como el hogar conyugal; que es la única propiedad que la menor ha reconocido; y que el derecho a dominio está supeditado a los intereses sociales de proteger a los menores, a la familia, y al hogar donde éstos residen".[40]

Igualmente, contempló el periodo de tiempo en que la vivienda reclamada como *hogar seguro* había sido la vivienda familiar de las partes. De igual modo, consideró que este derecho es uno estrictamente de naturaleza familiar, así, al atribuir la vivienda familiar al progenitor custodio no titular del inmueble en beneficio de su hijo, se busca "el mantenimiento de las mismas condiciones familiares existentes antes de la ruptura ... [lo que] constituye una forma de contribución a las cargas generadas con la separación o el divorcio que hay que afrontar".[41]

Podemos colegir que el derecho a *hogar seguro* reconocido en el Artículo 477 del Código Civil de Puerto Rico de 2020, no depende del interés propietario que pueda tener sobre el bien el jefe de familia, pues éste es un mecanismo de protección a la unidad familiar y de lo que ha sido el centro de la vida en común.[42]

---

[38] *Candelario Vargas v. Muñiz Díaz, supra*, pág. 543.
[39] *Íd*., pág. 544.
[40] *Id*.
[41] *Id*., pág. 545.
[42] 31 LPRA § 6851; *Candelario Vargas v. Muñiz Díaz, supra*, pág. 546.

### - B - *Custodia Compartida y Casa Nido*

Cuando ocurre una ruptura entre dos (2) progenitores, de los temas más delicados es la atribución de la vivienda familiar y la manera que se distribuirá el tiempo de estos con sus hijos. Cuando se habla de *custodia* en nuestra jurisdicción, esta se refiere a la "tenencia física del menor" y se les permite a ambos progenitores compartirla.[43]

La *custodia compartida* es una oportunidad que tienen ambos progenitores de cuidar y compartir con sus hijos. El Código Civil de Puerto Rico de 2020 reconoce la presencia activa de ambos progenitores en la vida de sus hijos y define *custodia compartida*, específicamente, como "la obligación de ambos progenitores de ejercer directa y totalmente todos los deberes y funciones que conlleva la patria potestad de los hijos, relacionándose con estos el mayor tiempo posible y brindándoles la compañía y atención que se espera del progenitor responsable."[44] Entre los factores a evaluar para la adjudicación de la *custodia compartida* mediante acuerdo voluntario entre los progenitores es su disponibilidad, un firme propósito de asumir tal responsabilidad, los recursos personales para hacerla viable y el interés óptimo del menor.[45] En estos casos, el tribunal debe de asegurarse que el acuerdo no sea producto de irreflexión o coacción.[46]

En todo caso donde el tribunal tenga que hacer una disposición de *custodia* este examinará los siguientes factores, sin incorporar ninguna presunción a favor o en contra de la *custodia compartida* o la exclusiva (conocida como monoparental):[47]

> "(a) la salud mental de ambos progenitores y de los hijos;
> (b) el nivel de responsabilidad o integridad moral exhibido por cada uno de los progenitores;
> (c) si ha habido un historial de violencia doméstica entre los integrantes del núcleo familiar;
> (d) la capacidad de cada progenitor para satisfacer las necesidades afectivas, económicas y morales del menor, tanto presentes como futuras;
> (e) el historial de cada progenitor en relación con sus hijos;

---

[43] Código Civil Año 2020 Comentado (en adelante, "Memorial Explicativo"), pág. 591.
[44] Artículo 602 del Código Civil de Puerto Rico 2020, 31 LPRA § 7281.
[45] Artículo 603 del Código Civil de Puerto Rico 2020, 31 LPRA § 7282.
[46] *Id.*
[47] Memorial Explicativo, pág. 585.

(f) las necesidades específicas de cada uno de los hijos menores cuya custodia se solicita;
(g) la relación del hijo con sus progenitores, sus hermanos y otros miembros de la familia;
(h) la capacidad, disponibilidad y compromiso de los progenitores de asumir la responsabilidad de criar los hijos conjuntamente;
(i) la razón o los motivos de los progenitores para solicitar la custodia compartida;
(j) si la profesión u oficio que ejercen los progenitores no es un impedimento para ejercer la custodia compartida;
(k) si la ubicación y distancia entre las residencias de los progenitores perjudica la educación del hijo;
(l) la comunicación que existe entre los progenitores y la capacidad para comunicarse mediante comunicación directa o utilizando mecanismos alternos; y
(m) cualquier otro criterio que pueda considerarse para garantizar el interés óptimo de los hijos."[48]

En esa línea, la *custodia compartida* no se concederá:

"(a) cuando uno de los progenitores sufre de una incapacidad o deficiencia mental, según determinada por un profesional de la salud, y la misma es de naturaleza irreversible y de tal magnitud que le impide atender adecuadamente a sus hijos y garantizar la seguridad e integridad física, mental y emocional de estos;
(b) cuando los actos u omisiones de uno de los progenitores resultan perjudiciales a los hijos o constituyen un patrón de ejemplos corruptores;
(c) cuando uno de los progenitores, su cónyuge o pareja consensual ha sido convicto por actos constitutivos de maltrato de menores;
(d) cuando uno de los progenitores se encuentra confinado en una institución carcelaria;
(e) cuando uno de los progenitores ha sido convicto por actos constitutivos de violencia doméstica;
(f) cuando uno de los progenitores ha cometido abuso sexual o cualquiera de los delitos sexuales tipificados en el Código Penal de Puerto Rico hacia algún menor; y
(g) cuando uno de los progenitores, su cónyuge o pareja consensual es adicto a drogas ilegales o a alcohol."[49]

Existen ocasiones que la *custodia compartida* tiene sus limitaciones como: no permitir una distribución de tiempo de convivencia igualitario con respecto a los progenitores.

El concepto de *casa nido* es uno reconocido en el derecho de familia español de aplicación cuando existen estos problemas. Empero, no es una opción favorecida y así lo refleja constantemente la jurisprudencia española.

En nuestra jurisdicción, la atribución de la vivienda familiar "protege al cónyuge que carece de medios propios para adquirir otra vivienda y la

---

[48] Artículo 604 del Código Civil de Puerto Rico de 2020, 31 LPRA § 7283.
[49] Artículo 605 del Código Civil de Puerto Rico de 2020, 31 LPRA § 7284.

protección del bienestar óptimo de los hijos que están bajo su custodia."[50] El criterio utilizado para poder solicitar la atribución es la necesidad.[51] No obstante, en la modalidad de *custodia compartida* conocida como *casa nido*, los menores permanecen en la vivienda familiar permanentemente mientras los progenitores alternan su uso. Entiéndase que, no reconoce la necesidad de algún cónyuge de permanecer en el inmueble por carecer de medios propios, si no que la atribución es exclusiva de los hijos. Así las cosas, ni se libera el domicilio familiar ni se atribuye el uso y disfrute del mismo al progenitor más necesitado de protección como surge con la figura de atribución preferente de la vivienda familiar en nuestra jurisdicción.

El enfoque de la *custodia compartida*, en su modalidad *casa nido*, es el permitirles a los hijos mantener su entorno habitual y estabilidad con el fin de que el impacto del divorcio de sus progenitores sea menor. Cabe recalcar que, la modalidad de *casa nido* no ha sido reconocida en nuestra jurisdicción. En cuanto a la estabilidad de los menores en el proceso de divorcio, el Tribunal Supremo de Puerto Rico reconoció en *Nudelman v. Ferrer Bolívar* que "el impacto emocional inicial será pasajero y de consecuencias análogas a aquellas que experimentan (sic) una parte sustancial de la población infantil en constante movimiento en un mundo contemporáneo de adultos que ese desenvuelve en continua movilidad por razones económicas, ocupacionales, personales y de otras índoles."[52]

Aun con el beneficio principal de estabilidad que la *custodia compartida* en su modalidad de *casa nido* le pudiese proveer a los menores, este régimen implica cuestiones que son de especial relevancia e importantes de considerar antes de su aplicación dado que traen consigo desventajas que tornan su propósito en contraproducente. Entre las dificultades reconocidas en la adopción del concepto *casa nido* se encuentran:

1. El intenso nivel que requiere de entendimiento y comunicación entre los progenitores para coordinar los

---

[50] Memorial Explicativo, pág. 410.
[51] *Id.*
[52] 107 DPR 495, 515 (1978).

requerimientos de intendencia y cuidado de la vivienda familiar.

2. La necesidad de correlativas interferencias positivas con las respectivas parejas con las que los progenitores reconstruyan sus vidas.

3. La implicación de alguna forma de economía colaborativa que deberá contar con la adhesión de los progenitores.

4. La necesidad de contar con una capacidad económica suficiente para sufragar los gastos de mantener tres (3) viviendas a la vez.

5. Los lazos íntimos que implica mantener una casa en común que puede impactar y traer conflicto entre una pareja que está en trámites de una separación o divorcio toda vez que una de las razones por la cual se puede decidir poner fin a su relación es la imposibilidad de convivencia.

Todos estos factores mencionados pueden crear conflictos continuos que terminan afectando a los más vulnerables: los menores. En vista de lo anterior, el Tribunal Supremo de España ha hecho las siguientes expresiones acerca de la *custodia compartida* en su modalidad *casa nido*:

"Es un sistema [...] que no es compatible con la capacidad económica de los progenitores, que se verían obligados a mantener tres viviendas (la de cada uno y la común), unido a la conflictividad que añadiría el buen mantenimiento de la vivienda común." [53]

"[D]ebemos declarar que la rotación en la vivienda familiar no es un sistema que vele por el interés de los menores, ni es compatible con la capacidad económica de los progenitores." [54]

"[A]dvertimos que su fijación requiere un intenso nivel de entendimiento y comunicación entre los progenitores para coordinar los requerimientos de intendencia y cuidado de la vivienda familiar, con la necesidad igualmente de las correlativas interferencias positivas, en su caso, con las respectivas parejas con las que los padres hayan podido reconstruir sus vidas, que deberán adoptarse también a este concreto modelo de convivencia."[55]

"En definitiva implica una fórmula de economía colaborativa, que deberá contar con la adhesión de los progenitores, que quieran y puedan atender a las exigencias que implica su puesta en marcha, lo que requiere de la existencia de un buen "co-parenting" – relaciones de los padres entre sí -. Todo ello, además, con el requisito de contar con una capacidad económica suficiente para sufragar los mayores gastos, que exige la adopción de este concreto patrón de decisión. El fracaso de una medida de tal clase lesionaría el interés y beneficio de los menores, en cuanto a su estabilidad y satisfacción de sus necesidades. [...] Es por ello que, dadas las dificultades expuestas, la jurisprudencia se muestra reticente a la adopción de una solución de tal clase, toda vez que implica contar con tres viviendas, la propia de cada padre y la común preservada para el uso rotatorio prefijado, solución que

---

[53] STS 215/2019, de 5 de abril.
[54] STS 343/2018, de 7 de junio.
[55] STS 3298-2024, de 29 de mayo.

resulta antieconómica, y que requiere un intenso nivel de colaboración entre los progenitores..."[56]

Así las cosas, nuestro ordenamiento se inclina a promover el interés óptimo del menor, algo que parece ser contrario a los efectos prácticos de la modalidad de *casa nido*. Además, como mencionado anteriormente, se ha reconocido que los menores son flexibles y se adaptan fácilmente a los cambios. En consecuencia, se puede concluir que la modalidad de *casa nido* no es una favorecida actualmente ni parece que llegaría a serlo en el futuro.

Cuando de inestabilidad se trata, hay cosas prácticas que los progenitores pueden hacer para aliviar este sentir sin incurrir en la modalidad de *casa nido*. Se entiende que lo más que contribuye a la estabilidad y al bienestar emocional de los menores es ver a sus progenitores bien y mantengan el mismo cariño por ellos a pesar de la separación, no necesariamente el espacio físico. Así, una manera de reducir la sensación "niño-maleta", que de cierta manera trata de evitar la *casa nido*, es procurar que los menores tengan de todo lo que pudiesen necesitar en las residencias de ambos progenitores.

Las opciones que existen en Puerto Rico son la atribución de la vivienda familiar, de manera temporal, al progenitor que tenga la *custodia* inmediata y se vea en una mayor necesidad, o la venta de la propiedad y la repartición entre ambos de la cantidad de dinero que resulte de esta. La aplicación de la modalidad *casa nido* solo luce viable en aquellos casos que la *custodia compartida* surja de un común acuerdo voluntario entre progenitores que guardan gran comunicación, tengan los medios económicos para el mantenimiento de tres (3) hogares, mucha inteligencia emocional y el interés óptimo del(de la) menor como prioridad.

## - III -

En su recurso intitulado *Alegato del Apelante*, el señor **RIVERA OYOLA** nos apuntó que el foro primario incidió al designar como *hogar seguro*, en la

---

[56] STS 870/2021, de 20 de diciembre.

modalidad de *casa nido*, la residencia ubicada en Plaza Serena #161 en Trujillo Alto, Puerto Rico. Ello, a pesar de reconocer que existe jurisprudencia persuasiva que no favorece dicho precepto, ignorando así, los aspectos que predicen el fracaso de la aplicación de la alternativa del *"bird nesting"* (presentes dos de los esenciales en este caso). Arguyó que, el tribunal apoyó su conclusión en especulaciones y se apartó de los factores implantados en nuestra ley y jurisprudencia a ser evaluados y considerados al momento de efectuar la designación del *hogar seguro*. Acotó que, la conclusión estuvo basada en el prejuicio, la pasión y la parcialidad.

Por otro lado, la señora **RIVERA TORRES** expuso que, al momento de la celebración de la audiencia sobre *hogar seguro* en septiembre de 2023, ya existía un dictamen que, desde el 8 de febrero de 2023, les otorgó la *custodia compartida* a las partes. Aceptó que lo que estaba pendiente era la providencia sobre *hogar seguro*.

El expediente atinente refleja que, en la *Demanda Enmendada* sobre divorcio, entablada el 28 de junio de 2022, por la señora **RIVERA TORRES**, ésta reclamó el *hogar seguro* a favor de los menores habidos. A continuación, el 23 de septiembre de 2022, el señor **RIVERA OYOLA** contestó la *Demanda Enmendada* y reconvino rogando, de igual manera, el *hogar seguro* en beneficio de sus hijos.

Como consecuencia, se requirió a la Unidad Social una evaluación social y el 8 de febrero de 2023, se celebró una audiencia sobre lectura del *Informe Social Forense* rendido por la señora Velázquez Cruz (trabajadora social). En dicha audiencia, ambas partes se allanaron a las recomendaciones contenidas en el *Informe Social Forense*.[57] La señora **RIVERA TORRES** se reservó el derecho, en relación con el menor EARR, de que, si posteriormente podía alquilar una casa cercana o si se le concedía el hogar seguro, **solicitaría la revisión del plan de visitas**. En respuesta, se le advirtió a la señora

---

[57] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 8 de febrero de 2023, en la pág. 7, líneas 19-25; pág. 8, líneas 1-17 y 22-25; pág. 9, líneas 1-5.

RIVERA TORRES que **podría solicitar con posterioridad reevaluar la** *custodia* **en cuanto al menor EARR**.[58] En esa misma fecha, se intimó una *Minuta Resolución* **acogiendo las recomendaciones del** *Informe Social Forense* y concediendo un término de treinta (30) días a ambas partes para que expusieran si era necesaria la audiencia en sus méritos sobre *hogar seguro*.[59]

Tras la solicitud de la señora RIVERA TORRES, el 6 de septiembre de 2023, se celebró la audiencia sobre *hogar seguro*. En síntesis, ambas partes reiteraron sus respectivas posiciones sobre *hogar seguro* y el tribunal apelado elucidó que emitiría su provisión con posterioridad.

Así, el 2 de octubre de 2023, se promulgó la *Resolución de Hogar Seguro* impugnada. El tribunal primario concluyó que la **residencia ganancial** sita en Trujillo Alto, Puerto Rico, sería gravada como *hogar seguro*, en la modalidad de *casa nido*, en beneficio de los tres (3) menores; y modificó el plan filial de la *custodia compartida* dispuesta mediante la *Minuta Resolución* fechada 8 de febrero de 2023.

---

[58] Véase, *Transcripción de la Prueba Oral* (**TPO**) de la audiencia celebrada el 8 de febrero de 2023, en la pág. 12, líneas 1-2.

[59] Apéndice del *Alegato del Apelante*, págs. 141- 144. Dicha *Minuta Resolución* precisa:
1. La custodia de las menores [NM y [MS] se otorga de forma compartida a ambos padres. Se aclara que la joven [MS] reside en los Estados Unidos por acuerdo de ambos padres. No se recomienda horario porque el tiempo dependerá de la disponibilidad de las menores, según su responsabilidad y compromisos.
2. Se concede custodia compartida del menor **[EA]** a ambos padres.
3. **Se establece el plan de custodia de la siguiente manera:**
   a. **El menor [EA] estará con la madre los primeros dos fines de semanas y el último fin de semana de viernes a las 5:00 de la tarde hasta el domingo a las 6:00 de la tarde.**
   b. **El menor [EA] estará con el padre de lunes a viernes y el penúltimo fin de semana del mes desde el viernes a la salida de la escuela hasta el siguiente viernes, cuando le corresponderá estar con la madre.**
4. El día de las madres y de los padres, los menores compartirán con el progenitor correspondiente desde el día antes hasta el día de la celebración. En el caso de [EA], si es que no coincide con el plan de custodia compartida.
5. Durante el periodo navideño, los progenitores tendrán a los menores la mitad del tiempo del receso de clases. La primera mitad la tendrá un progenitor y la segunda mitad el otro progenitor. Se alternarán cada año. Como alternativa, las partes pueden dividir en partes iguales los días festivos por acuerdo. De no lograr un acuerdo para esas fechas, deberán someter el horario escolar.
6. Ambos progenitores se integrarán a todos los asuntos de [EA] y colaborarán en la búsqueda y los servicios que requiera el menor, incluyendo los servicios en el área académica. Además, deberán mantener los servicios con la neuróloga.
7. Los padres deberán mantener un ambiente seguro para los hijos. Además, los padres deberán mantenerse informado[s] sobre los asuntos de los hijos.

Justipreciado el legajo judicial, así como la transcripción de la prueba oral, colegimos que el tribunal de instancia no erró al decretar como *hogar seguro* la **propiedad ganancial** sita en Trujillo Alto, Puerto Rico, en beneficio de los menores. Aun así, somos del criterio que el foro primario se extralimitó al disponer que el inmueble gravado se utilizaría en modalidad de *casa nido*, figura ajena y atípica a nuestro estado de derecho. En el caso de marras, el señor **RIVERA OYOLA** se opuso tenazmente a dicha modalidad de *hogar seguro*, la cual no está legislada, y no la aceptó de forma voluntaria. Toda vez que las particularidades del caso apuntan a que no es el caso idóneo para disponer la figura de *casa nido* ello ante un perfil adverso en términos de comunicación entre las partes; aspectos de capacidad económica para sufragar tres (3) residencias; y problemas de convivencia.

Al momento de otorgar el *hogar seguro*, debemos evocar los criterios a sopesar acorde al Artículo 478 del Código Civil de Puerto Rico 2020.[60] En este caso, percibimos que el foro de instancia no tomó en consideración la totalidad de las circunstancias de **ambos progenitores.** Es un hecho cierto que, el señor **RIVERA OYOLA** se opuso al *hogar seguro*, en su modalidad de *casa nido*, por las condiciones de salud del menor EARR y su situación económica.[61] A su vez, el tribunal apelado alteró el plan filial de la *custodia*

---

[60] A saber: (a) los acuerdos de los cónyuges sobre el uso y el destino de la vivienda durante la vigencia del matrimonio y después de su disolución; (b) si el cónyuge solicitante mantiene la custodia de los hijos menores de edad; (c)si el cónyuge solicitante retiene la patria potestad prorrogada o la tutela de los hijos mayores incapacitados o con impedimentos físicos que requieren asistencia especial y constante en el entorno familiar; (d) si los hijos mayores de edad, pero menores de veinticinco (25) años, permanecen en el hogar familiar mientras estudian o se preparan para un oficio; (e) si la vivienda familiar es el único inmueble que puede cumplir razonablemente ese propósito dentro del patrimonio conyugal, sin que se afecte significativamente el bienestar óptimo de los beneficiados al momento de su concesión con más necesidad de protección; (f) si el cónyuge solicitante, aunque no tenga hijos o, de tenerlos, no vivan en su compañía, necesita de esa protección especial, por su edad y situación personal; y (g) cualquier otro factor que sea pertinente para justificar el reclamo.

[61] Debemos aleccionar al foro de instancia que sus reseñas en relación con la condición económica del señor **RIVERA OYOLA** incluidas en la *Resolución de Hogar Seguro* fueron totalmente innecesarias e insensibles. Nuestro Tribunal Supremo en el caso *Santiago, Maisonet v. Maisonet Correa*, 187 DPR 550 (2012), reitero la norma establecida en *Mundo v. Cervoni*, 115 DPR 422 (1984), en cuanto a que la labor que un progenitor realiza en el hogar cuando administra la pensión que el alimentante aporta se considera un descargo de su propia obligación de alimentar, ello citando a *Toro Sotomayor v. Colón Cruz*, 176 DPR 528, 535 (2009). En este caso, no cabe duda de que el señor **RIVERA OYOLA** aportó significativamente al bienestar del menor EARR mientras este estuvo en los Estados Unidos bajo el sistema de "*homeschooling*" (educación en casa), y a su vez al sustento y cuidado de la menor MSRR. Quizás su aportación no fue monetaria pero sí en beneficio del mejor bienestar, interés óptimo y el cuidado responsable de sus hijos menores de edad.

*compartida*, sin tener una petitoria sobre modificación y sin base o fundamento alguno. Aún más, la adjudicación del plan filial de la *custodia compartida* acogida mediante la *Minuta Resolución* había advenido final y firme. La audiencia pautada para el 6 de septiembre de 2023 tenía el propósito de designar el *hogar seguro*, no alterar el plan filial de la *custodia compartida*. Cónsono con lo anterior, discernimos que el Tribunal erró al variar o trastocar el plan filial de la *custodia compartida* dispuesta por la *Minuta Resolución* fechada 8 de febrero de 2023 y ello no se ajusta a la realidad de las partes.[62]

Así las cosas, según acogido por el tribunal de instancia en la *Minuta Resolución* del 8 de febrero de 2023, y sin haberse requerido la modificación del plan filial de la *custodia compartida*, es preciso determinar que la mayoría del tiempo, de la tenencia física, de los menores es a favor del señor **RIVERA OYOLA**. Lo cual resulta en aproximadamente un setenta y tres (73%) por ciento de la *custodia compartida* a su favor. Por lo tanto, corresponde que se establezca el *hogar seguro* de la residencia ubicada en Encantada en Trujillo Alto, en beneficio del menor EARR y a favor del señor **RIVERA OYOLA**.[63] Ello, con el propósito de promover el interés óptimo del menor EARR. Toda vez que el Código Civil de Puerto Rico 2020 precisa las condiciones y el plazo en que se disfrutará la concesión del derecho a permanecer en la vivienda familiar, concluimos que el mismo tendrá una vigencia hasta que el menor

---

[62] El 25 de septiembre de 2024, la trabajadora social Velázquez Cruz presentó *Moción de Estatus* en la cual informó que el plan dispuesto sobre *hogar seguro, casa nido,* no se ha llevado a cabo y los menores MMRR y EARR residen con el señor **RIVERA OYOLA** en Trujillo Alto, y comparten tres (3) fines de semana al mes con la señora **RIVERA TORRES** quien reside en Barranquitas.

[63] Tomamos conocimiento judicial de que el 8 de julio de 2024 mediante *Resolución de Relevo de Pensión Alimentaria,* la señora **RIVERA TORRES** fue relevada del pago de la *pensión alimentaria* a favor de la joven NMRR, ello efectivo al 1 de julio de 2024. Asimismo, el 25 de marzo de 2025 mediante *Resolución Final Resolución de Relevo de Pensión Alimentaria,* el señor **RIVERA OYOLA** [SIC] fue relevado de la *pensión alimentaria* en beneficio de la joven MSRR, ello efectivo a 1 de febrero de 2025. Ambas por advenir a la mayoría de edad. Aún permanece vigente una *Orden* refiriendo el caso a la consideración de la Examinadora de Pensiones Alimentarias para fijar una nueva *pensión alimentaria* en beneficio del menor EARR. Véase, Entradas Núm. 128, 150 y 121 del expediente electrónico del Sistema Unificado de Manejo y Administración de Casos (SUMAC) en el caso **CA2022RF00436**.

EARR advenga a la mayoría de edad o hasta que culmine sus estudios universitarios, de aplicar.[64]

- IV -

Por los fundamentos antes expuestos, **revocamos** la *Resolución de Hogar Seguro* promulgada el 2 de octubre de 2023 por el Tribunal de Primera Instancia, Sala Superior de Carolina, a los efectos de **eliminar** que la **residencia ganancial** dispuesta como *hogar seguro* se utilizará en la modalidad de *casa nido;* **dejamos** sin efecto la alteración del plan filial de la *custodia compartida*- cada dos (2) semanas para cada uno de los progenitores con su hijo EARR; **mantenemos** en vigor la *custodia compartida* dispuesta mediante *Minuta Resolución* de 8 de febrero de 2023.  En consecuencia, se le otorga el *hogar seguro* de la referida propiedad sita en Encantada en Trujillo Alto, Puerto Rico, a favor del menor EARR y del señor **EDWIN ELÍAS RIVERA OYOLA.** *Devolvemos* el caso al foro primario para la continuación de los procedimientos de forma compatible con nuestros pronunciamientos.

Al amparo de la Regla 18 (B) de nuestro Reglamento, el Tribunal de Primera Instancia, Sala Superior de Carolina, puede proceder de conformidad con lo aquí resuelto, sin tener que esperar por el recibo de nuestro mandato.[65]

Lo acordó el Tribunal, y lo certifica la Secretaría del Tribunal de Apelaciones.

**Notifíquese inmediatamente.**

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[64] Artículo 479 del Código Civil de Puerto Rico 2020, 31 LPRA § 6853.

[65] Regla 18 (B): "Cuándo no se suspenderá No se suspenderán los procedimientos en el Tribunal de Primera Instancia cuando la sentencia dispusiere la venta de bienes susceptibles de pérdida o deterioro. En ese caso el Tribunal de Primera Instancia podrá ordenar que dichos bienes sean vendidos y su importe depositado hasta tanto el Tribunal de Apelaciones dicte sentencia. No se suspenderán los efectos de una decisión apelada, salvo una orden en contrario expedida por el Tribunal de Apelaciones, por iniciativa propia o a solicitud de parte, cuando esta incluya cualesquiera de los remedios siguientes: (1) una orden de *injunction*, de *mandamus* o de hacer o desistir; (2) una orden de pago de alimentos; (3) una orden sobre custodia o relaciones filiales". Regla 18 del Reglamento del Tribunal de Apelaciones, según enmendada, *In Re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 42, pág. 36, 215 DPR ____ (2025).